1

2

3

4

5

6

7

8 # UNITED STATES DISTRICT COURT

9 ### EASTERN DISTRICT OF CALIFORNIA

10

11 | KOUM PEO, | Case No. 1:16-cv-00834-LJO-SAB |

12 | Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING DENYING

13 | v. | PLAINTIFF'S SOCIAL SECURITY APPEAL

14 | COMMISSIONER OF SOCIAL SECURITY, | (ECF Nos. 22, 23) |

15 | Defendant. | OBJECTIONS DUE WITHIN FOURTEEN

16 | | DAYS |

17

18

19 **I.**

20 ### INTRODUCTION

21 Plaintiff Koum Peo ("Plaintiff") seeks judicial review of a final decision of the

22 Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for

23 disability benefits pursuant to the Social Security Act. The matter was referred to a United

24 States magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.

25 Plaintiff suffers from insomnia, depressive disorder, anxiety disorder, and migraines. For

26 the reasons set forth below, the Court recommends that Plaintiff's Social Security appeal be

27 denied.

28 / / /

Plaintiff protectively filed an application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income on November 21, 2012. (AR 69, 70.)  Plaintiff's applications were initially denied on May 7, 2013, and denied upon reconsideration on September 25, 2013.  (AR 113-115, 116-118, 97-112.)  Plaintiff requested and received a hearing before Administrative Law Judge Trevor Skarda ("the ALJ").  Plaintiff appeared for a hearing on June 2, 2014.  (AR 41-68.)  On December 8, 2014, the ALJ found that Plaintiff was not disabled.  (AR 20-36.)  The Appeals Council denied Plaintiff's request for review on April 15, 2016.  (AR 1-3.)

### A.  Hearing Testimony

Plaintiff appeared with counsel and testified at the June 2, 2014 hearing with the assistance of a Cambodian interpreter.  (AR 43.)

Plaintiff was born on August 21, 1961, and came to the United States on July 13, 1983. (AR 47.)  Plaintiff has very little education.  (AR 47.)  Plaintiff took English as a Second Language classes for a short time, but quit because she had to go to work.  (AR 47.)  Plaintiff speaks a little English.[1]  (AR 43.)  At home, Plaintiff's family usually speaks Cambodian.  (AR 47.)

Plaintiff lives with her husband, son, and grandson.  (AR 47.)  Plaintiff has a driver's license and drives three times a week to go with her husband to his dialysis appointments.  (AR 48.)  Plaintiff's husband also drives and he is currently on dialysis.  (AR 48.)  Plaintiff's husband has been sick for a long time and started dialysis about a year and a half before the hearing.  (AR 49.)  In the evening, Plaintiff takes care of her husband, dressing him, cooking for him, and giving him shots.  (AR 48.)  Her in-laws help.  (AR 48.)

Plaintiff was able to work as an order taker because she speaks a little bit of English and they have a lot of Cambodians who work there.  (AR 47.)  Plaintiff stopped working because her

---

[1] Plaintiff was answering questions prior to them being interpreted at the hearing.  (AR 51.)

husband was so sick, she had to take care of him, and could not sleep at night so she was so tired. (AR 49.) Plaintiff also had headaches. (AR 49.) Plaintiff could not sleep at night because she was thinking about her and her husband's illnesses. (AR 49.) Plaintiff had headaches before her husband became ill, but since he got ill she has more headaches and is not able to sleep at all. (AR 49.) She thinks too much at night. (AR 49.) She got headaches when she was working, and someone would give her a massage and she would take her medication. (AR 52.) Plaintiff sometimes has dizziness. (AR 49.)

Plaintiff has headaches every day. (AR 49.) Plaintiff's headaches are so severe that they cause her to cry. (AR 50.) Her husband will give her a massage. (AR 50.) She frequently has severe headaches, every two to three days, that last two to three hours. (AR 50.) When she has a severe headache she just sits there and cries and tries to take her pills. (AR 50.) After she takes her pills, Plaintiff will lie down. (AR 51.) Plaintiff takes medication for her headaches. (AR 51.)

Plaintiff has not sought mental health treatment because she does not have insurance. (AR 52.) She pays in cash to go to the doctor because they do not charge her much. (AR 52.)

Plaintiff is unable to work now due to anxiety, fatigue, and poor eyesight. (AR 52.) Plaintiff is exhausted because of her headaches and her sleeplessness. (AR 52.) Plaintiff wakes up tired in the morning. (AR 52.) Plaintiff does not take naps during the day. (AR 53.) Sometimes when she is sitting and watching television she will feel herself falling asleep so she gets up and walks. (AR 53.) Plaintiff has trouble concentrating because she thinks a lot. (AR 53.)

Her husband's dialysis appointments last three and a half to four hours. (AR 53.) Plaintiff stays with her husband and takes care of him while he is there. (AR 54.) She will cover him with a blanket, wait with him while he has muscle spasm, and such. (AR 54.) Plaintiff will then go home. (AR 54.) Plaintiff has applied for Medicare but has not received a response. (AR 54.)

Plaintiff's daughter, Mary Silva, also testified at the hearing. (AR 54.) Ms. Silva lives about five minutes away from Plaintiff and sees her about twice a week for an hour. (AR 55.)

Ms. Silva moved out of the house twelve years ago. (AR 55.) Ms. Silva has been an intern at an alcohol and drug treatment facility for the last three years. (AR 55.) She is working on becoming certified and needs to complete 2,080 hours. (AR 63.) Ms. Silva sees a lot of people with depression. (AR 63.) She has been pushing her mother to get treatment but does not know why she will not get treatment. (AR 63.) It might be because of their culture. (AR 63.) They are Asian and do not really believe in it and want to try different methods. (AR 63-64.) Plaintiff does not want to talk about the past and stuff because she gets overly emotional and has anxiety. (AR 64.)

When Ms. Silva was in school, Plaintiff was working and would go to parent-teacher conferences. (AR 56.) They would go out of town to do things, go shopping, and Plaintiff would attend her grandchildren's school functions. (AR 56.) Plaintiff continued doing these things even after Ms. Silva moved out of the house. (AR 56.) Plaintiff would keep things neat in her house. (AR 56.)

After Plaintiff's husband became ill, Plaintiff became depressed. (AR 57.) Plaintiff was unable to go to work and had bad migraines that kept her up all night. (AR 57.) Plaintiff was unable to sleep and had no appetite. (AR 57.) Ms. Silva would not hear from Plaintiff for 2 or 3 days and when she talked to Plaintiff she would say that she had not gone to work for several days because she was not sleeping. (AR 57.) This was about two years before Plaintiff stopped working. (AR 57.) Ms. Silva and the family have tried to get Plaintiff to do more. (AR 57.) They will go over to the house in the afternoon and she would not have eaten because she said she had no appetite. (AR 58.) There would still be laundry in her room and in the laundry room which she normally would not do. (AR 58.) Ms. Silva would help out but it was hard to sit and hear Plaintiff talk about how depressed she is so she would leave early. (AR 58.)

Plaintiff's husband has had a caretaker for the past four months. (AR 58.) Plaintiff goes to dialysis with her husband once or twice every two weeks now. (AR 58.) Prior to him having a caretaker, Plaintiff was taking her husband to his dialysis appointments. (AR 59.) Plaintiff does not talk to family. (AR 59.) She has nine siblings and does not communicate with them or her children until they reach out to her. (AR 59.) Plaintiff's son will go over and mow the lawn

1   when it is needed and will pick up food to take over.  (AR 59.)  He stops by to do chores around

2   the house and yardwork.  (AR 65.)  The caretaker helps Plaintiff's husband take his medications

3   and takes him to dialysis and doctor's visits.  (AR 59.)

4         Plaintiff cooks for herself and her husband, but not always.  (AR 60.)  Ms. Silva or her

5   brother will bring meals over.  (AR 60.)  They talk about Ms. Silva's siblings or what was on

6   television or what they did today.  (AR 60-61.)  Plaintiff will talk over people.  (AR 61.)  Her

7   condition does not seem to have taken a big toll on Plaintiff's memory but Ms. Silva will

8   sometimes notice issues.  (AR 61.)

9         Plaintiff and her family used to be involved in Cambodian New Year.  (AR 61.)  There

10  was something big going on at the temple five to six times a year.  (AR 62.)  Plaintiff's family

11  still goes to these things, but Plaintiff will not go.  (AR 62.)  Plaintiff will say she did not sleep or

12  she is not up to going.  (AR 62.)  She does not go to temple now.  (AR 62.)  Plaintiff's husband's

13  health is a factor in her lack of involvement at the temple.  (AR 62.)  Plaintiff is fearful because

14  her husband almost died a few years ago.  (AR 63.)  Plaintiff's husband almost died around

15  September 2012 about the time that Plaintiff stopped working.  (AR 63.)  Plaintiff is a refugee

16  and that took a toll on her.  (AR 62.)  She is seeing people she grew up with, like her parents,

17  passing away.  (AR 63.)  Plaintiff is not able to do much outside the house because of her

18  husband's illness.  (AR 64.)

19        Before her husband got sick, Plaintiff was outgoing and involved in the community and

20  her children's lives.  (AR 64.)  Now Plaintiff does not like going to birthdays for her

21  grandchildren.  (AR 64.)

22        A vocational expert, Thomas L. Sartoris also testified at the hearing.  (AR 65-66.)

23        **B.**    **ALJ Findings**

24        The ALJ made the following findings of fact and conclusions of law:

25  •  Plaintiff meets the insured status requirements of the Social Security Act through

26     December 31, 2017.

27  •  Plaintiff has not engaged in substantial gainful activity since September 15, 2012, the

28     alleged onset date.

- Plaintiff has the following severe impairments: depressive disorder, anxiety disorder, and migraines.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity to perform medium work, except no climbing ladders, ropes, or scaffolds; occasional balancing and stooping; must avoid moderate exposure to operational control of moving machinery as well as unprotected heights; is limited to simple, routine, repetitive tasks that are also low stress, defined as no more than occasional decision making or changes in the work setting with occasional public and co-worker contact.

- Plaintiff is capable of performing her past relevant work as an order picker/order puller. This work does not require the performance of work-related activities precluded by her residual functional capacity.

- Plaintiff has not been under a disability, as defined by the Social Security Act, from September 15, 2012, through the date of this decision.

(AR 25-36.)

### III.

### LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

///

Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.

Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.

Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.

Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.

Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be

1 upheld.").

**DISCUSSION AND ANALYSIS**

Plaintiff argues that the ALJ erred because 1) the ALJ's residual functional capacity finding is based on insubstantial evidence and legal error; 2) the ALJ failed to give specific and legitimate reasons for rejecting the opinion of Plaintiff's treating physician, Dr. Le; 3) the ALJ failed to give specific and legitimate reasons for rejecting the opinions of the examining psychiatrist and psychologists, Drs. DeBattista, Morgan, and Martin; and 4) the ALJ failed to give legally adequate reasons for discrediting the testimony of Plaintiff and her daughter. Defendant responds that the ALJ's properly assessed the medical evidence, the RFC is supported by substantial evidence in the record, and the ALJ's gave legally sufficient reasons for the credibility findings that are supported by substantial evidence.

**A.    Witness Credibility**

Plaintiff contends that the ALJ failed to give legally adequate reasons to reject the testimony of Plaintiff and her daughter.

1.    Plaintiff's Credibility

"An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation and citations omitted). Determining whether a claimant's testimony regarding subjective pain or symptoms is credible, requires the ALJ to engage in a two-step analysis. Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012). The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted). This does not require the claimant to show that her impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms. Smolen, 80 F.3d at 1282.

///

Second, if the first test is met and there is no evidence of malingering, the ALJ can only reject the claimant's testimony regarding the severity of her symptoms by offering "clear and convincing reasons" for the adverse credibility finding. Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1160 (9th Cir. 2008). The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony. Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal punctuation and citations omitted).

Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors. Lingenfelter, at 1040; Thomas, 278 F.3d at 958. In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment. . . ." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284).

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms alleged, but that Plaintiff's statements regarding the intensity, persistence, and limiting effects of the symptoms were not entirely credible. (AR 29.)

The ALJ considered that Plaintiff alleged she was unable to work due to depression, anxiety, sleep problems, vision problems, worsening migraines, and breathing problems. (AR 28.) Plaintiff stated that her migraines occurred on a regular basis and had become unbearable. (AR 28.) Plaintiff had to lie down when she had a migraine and could not keep her balance when she was upright. (AR 28.) Plaintiff also stated that it was difficult for her to perform activities of daily living and she had to rely on others for help. (AR 28.) Plaintiff further stated

that she was the only one to take her husband to his dialysis appointments and she was having difficulty coping with her husband's illness which affected her ability work, remember things, concentrate, and sleep. (AR 28.) Plaintiff stated that she could not work due to her anxiety and exhaustion due to her poor sleep and headaches. (AR 28.) Plaintiff explained that she had severe headaches every two to three days that lasted up to three hours and when she had one she would sit down and cry and take medication. (AR 28.) Plaintiff testified that she did not receive mental health treatment because she did not have insurance and could not afford it but could see her primary care doctor because he only charged her a little cash. (AR 28.)

### a. Daily Activities

There are two ways for an ALJ to "use daily activities to form the basis of an adverse credibility determination: if the claimant's activity contradicts his testimony or if the claimant's activity meets the threshold for transferable work skills." Phillips v. Colvin, 61 F. Supp. 3d 925, 944 (N.D. Cal. 2014).

Plaintiff argues that the ALJ failed to elaborate on which daily activities contradicted what part of her testimony citing Burrell v. Colvin, 775 F.3d 1133 (9th Cir. 2014). In Burrell, the ALJ did not elaborate on which daily activities conflicted with which part of the plaintiff's daily activities and the only mention of activities was found five pages earlier in the decision. Id. at 1138. That is not the case here where the ALJ set forth the testimony regarding Plaintiff's alleged limitations and then stated that Plaintiff's daily activities are not limited to the extent one would expect given her complaints of disabling symptoms and limitations. (AR 29.)

The ALJ found Plaintiff is able to attend to her personal care independently, do light household chores, prepare simple meals, watch television, use the treadmill, use the telephone, take public transportation, make change at the store, drive her husband to appointments three times per week, wait for him for about four hours while he undergoes dialysis, give him shots, cook for him, and dress him. (AR 29.) The ALJ found that Plaintiff's ability to participate in these activities diminish the credibility of her allegations of functional limitations. (AR 29.) The ALJ also referenced the following evidence in the record.

/ / /

At her psychological disability evaluation on April 9, 2013, Plaintiff told Dr. Martin the she is independent in her basic activities of daily living. (AR 258.) She is able to prepare simple meals and do light household chores. (AR 258.) She can make change at the store and take public transportation. (AR 258.) Plaintiff is able to drive but does so on a limited basis. (AR 258.) Plaintiff reported that she spent her day at home resting. (AR 258.)

On November 3, 2013, Plaintiff told Dr. Morgan that when she was feeling well she will do things around the house but when she is down with a migraine she will lie down and do nothing. (AR 307.) Plaintiff's daughter clarified that Plaintiff sits at home like a zombie and is engaged in minimal domestic activities as these are done primarily by her children who prepare meals, provide transportation, and assist their parents in paying the bills. (AR 307.) Plaintiff does not even watch television. (AR 307.) Plaintiff also reported that she used to walk but no longer has the energy for walking. (AR 307.)

On November 15, 2013, Plaintiff reported that although she is no longer working, she works around the house and gets on the treadmill a couple times a week. (AR 296.)

At the June 2, 2014 hearing Plaintiff testified that she has a driver's license and drives three times a week to go with her husband to his dialysis appointments. (AR 48.) Plaintiff's husband also drives. (AR 48.) Plaintiff's husband has been sick for a long time and started dialysis about a year and a half before the hearing. (AR 49.) His dialysis appointment lasts three and a half to four hours. (AR 53.) Plaintiff stays with her husband and takes care of him while he is there. (AR 54.) She will cover him with a blanket, wait with him while he has muscle spasm and such. (AR 54.) In the evening, Plaintiff takes care of her husband, dressing him, cooking for him, and giving him shots. (AR 48.) Her in-laws help. (AR 48.) Sometimes when she is sitting and watching television Plaintiff will feel herself falling asleep so she gets up and walks. (AR 53.)

At the hearing, Plaintiff's daughter testified that Plaintiff's husband has had a caretaker for the past four months. (AR 58.) Plaintiff goes to dialysis with him once or twice every two weeks now. (AR 58.) Prior to him having a caretaker, Plaintiff was taking her husband to dialysis. (AR 59.) Plaintiff does not always cook for herself and her husband, sometimes she or

her brother will bring a meal by. (AR 60.)

On August 23, 2014, Plaintiff reported to Dr. DeBattista that she does some chores, is able to drive and is generally independent in her own activities of daily living. (AR 314.)

The Court finds that the ALJ identified the testimony that was found to be not credible and the evidence that undermined Plaintiff's complaints. Burrell, 775 F.3d at 1138. Substantial evidence supports the ALJ's finding that Plaintiff's activities of daily living are not limited to the extent one would expect given her complaints of disabling symptoms and limitations.

### b. Reason for Stopping Working

The ALJ also considered that there was evidence that Plaintiff stopped working for reasons not related to her impairments and this weighed against the alleged severity of her symptoms and limitations. (AR 29.) Plaintiff testified at the hearing that she had voluntarily stopped working as an order puller to care for her husband when he went on dialysis. (AR 29.) When asked by the ALJ at the June 2, 2014 hearing why she stopped working, Plaintiff replied, "My husband been so sick and then I have to take care of him and I can't sleep at all at night and I'm so tired. I have headache too." (AR 49.) The ALJ also considered that during an interview at the field office, Plaintiff stated that she was having a hard time coping since have to take care of her elderly ill husband. (AR 28, 202.) It had affected her ability to work, remember things, concentrate, and sleep. (AR 202.) Her husband requires dialysis every other day for 4-5 hours and she is the only one that can take him. (AR 202.)

Plaintiff argues that the AL's interpretation is a misrepresentation of the testimony at the hearing. Although the evidence may be interpreted in a light more favorable to Plaintiff, the ALJ's interpretation is rational and "[w]e must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation." Burch, 400 F.3d at 680–81 (quoting Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989)).

Substantial evidence supports the ALJ's finding that Plaintiff stopped working for reasons not related to her impairments.

/ / /

/ / /

### c. Failure to Seek Treatment

The ALJ also found that Plaintiff had not received the type of medical treatment that one would expect from a disabled individual, specifically she reported a history of depression and anxiety symptoms, but denied ever seeing a psychiatrist, being hospitalized for psychiatric treatment, or receiving psychotherapy.  (AR 29.)  While an "unexplained, or inadequately explained, failure to seek treatment" may be the basis for an adverse credibility finding, <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir. 1989), Plaintiff has testified that she failed to seek psychiatric treatment due to lack of medical insurance but the ALJ noted that she was able to receive treatment by her medical providers.  Further, Plaintiff's daughter testified that she does not know why her mother does not seek mental health treatment and thinks it may be cultural and they do not believe in it.  (AR 63-64.)  However, the record reflects that Plaintiff received very limited medical treatment and her inability to seek mental health treatment due to lack of medical insurance is not a clear and convincing reason for an adverse credibility finding. <u>Carmickle</u>, 533 F.3d at 1162.

### d. The ALJ provided Clear and Convincing Reasons to Find Plaintiff's Complaints Not Credible

Although one of the reasons provided by the ALJ to reject Plaintiff's testimony has been found to be not proper, any such error is harmless as the ALJ provided two other reasons for the adverse credibility finding.  <u>Carmickle</u>, 533 F.3d at 1162.  The ALJ provided clear and convincing reasons for the adverse credibility finding that are supported by substantial evidence in the record.

### 2. Mary Silva's Credibility

Plaintiff contends that the ALJ erred in rejecting her daughter's credibility.  "In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work."  <u>Stout</u>, 454 F.3d at 1053; 20 C.F.R. § 404.1513(d)(4).  "Lay witness testimony is competent evidence and cannot be disregarded without comment." <u>Bruce v. Astrue</u>, 557 F.3d 1113, 1115 (9th Cir. 2009) (quoting <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1467 (9th Cir. 1996)).  The ALJ must give specific reasons germane to the witness in discounting

the lay witness testimony.  Stout, 454 F.3d at 1056.  ).  If the ALJ gives reasons for rejecting the claimant's testimony that are equally relevant to similar testimony provided by lay witnesses, that would support a finding that the lay witness testimony is similarly not credible.  Molina, 674 F.3d at 1114.

Plaintiff does not identify the specific testimony of Ms. Silva that the ALJ erred in rejecting other than to state that Ms. Silva observed the physical and mental deterioration of her condition.  The ALJ considered Ms. Silva's testimony at the hearing that Plaintiff had become increasing depressed after she quit working in September 2012 to care for her husband and that Plaintiff was not able to do much outside the house since she started caring for him.  (AR 29.)  Ms. Silva also testified that Plaintiff did not maintain the house or social contacts like she previously had and that she and her brother would take turns checking in on her.  (AR 29.)  The ALJ rejected Plaintiff and Ms. Silva's testimony as to the duration, intensity and functionally limiting effects of Plaintiff's impairments due to the inconsistencies in the record as a whole.  (AR 30.)

At the hearing, Ms. Silva testified that she sees her mother about two times per week.  (AR 55.)  She has been trying to have her mother seek mental health treatment but she is not sure why she will not.  (AR 63.)  It might be because it their culture does not believe in such treatment and wants to try different methods.  (AR 63-64.)  Also, Plaintiff does not want to talk about the past because she gets overly emotional and has anxiety.  (AR 64.)  For about two years before she stopped working, and after her husband became ill, Plaintiff would tell Ms. Silva that she had not gone to work for several days because she was not sleeping.  (AR 57.)  Plaintiff's husband almost died about the time that she stopped working.  (AR 63.)

Plaintiff does not keep her house as neat as she did in the past.  (AR 56-57.)  When the children stop by there might be laundry in Plaintiff's room and in the laundry room which would not normally be the case, and Plaintiff might not have eaten because she said she had no appetite.  (AR 58.)  Plaintiff's mother is depressed and does not want to talk to the family.  (AR 49.)  Plaintiff cooks for herself and her husband, but Ms. Silva will occasionally take food by or her brother will stop by here or there and bring food, do chores around the house, or yardwork.  (AR

59-60, 65.) Plaintiff's husband has a caretaker for the last four months so Plaintiff only goes to dialysis with him once or twice every two weeks. (AR 58.) His caretaker drives him to dialysis now, but Plaintiff was taking him before he had a caretaker. (AR 58.)

When Ms. Silva stops by they will talk about Ms. Silva's siblings or what was on television or what they did that day. (AR 61.) Plaintiff will talk over people, but her condition does not seem to have taken a big toll on her memory. (AR 61.) Plaintiff does not want to go with the family to events at the temple which she used to do. (AR 62.) She is not able to do much outside the house because of her husband's illness. (AR 62.)

To the extent that Ms. Silva testified that Plaintiff stopped working due to her impairments, as addressed above, the ALJ found evidence in the record that Plaintiff stopped working for reasons not related to her impairments. (AR 29.) Further, the ALJ addressed that Plaintiff's ability to participate in specific activities diminish the credibility of her allegations of functional limitations. (AR 29.) Where the ALJ provides a clear and convincing reason to reject Plaintiff's own subjective complaints, and the lay witness testimony is similar to such complaints, the ALJ has provided germane reasons for rejecting the lay witness testimony. Valentine v. Commissioner of Social Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009); see also Molina, 674 F.3d at 1121 ("where the ALJ rejects a witness's testimony without providing germane reasons, but has already provided germane reasons for rejecting similar testimony, we cannot reverse the agency merely because the ALJ did not 'clearly link his determination to those reasons' ").

Although Ms. Silva also testified that her mother was not as socially active as she was before her husband became ill, these statements do not provide functional limitations but are incorporated in the RFC by the finding that Plaintiff was limited limited to simple, routine, repetitive tasks that are also low stress, defined as no more than occasional decision making or changes in the work setting with occasional public and co-worker contact.

The Court finds that any error in providing a germane reason to reject Ms. Silva's testimony in this instance would be harmless. McLeod v. Astrue, 640 F.3d 881, 888 (9th Cir. 2011) (harmless error rule applies in Social Security case).

## B. Medical Opinion Testimony

The weight to be given to medical opinions depends upon whether the opinion is proffered by a treating, examining, or non-examining professional. See Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995). In general a treating physician's opinion is entitled to greater weight than that of a nontreating physician because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual." Andrews v. Shalala, 53 F.3d 1035, 1040-41 (9th Cir. 1995) (citations omitted). If a treating physician's opinion is contradicted by another doctor, it may be rejected only for "specific and legitimate reasons" supported by substantial evidence in the record. Ryan v. Commissioner of Social Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (quoting Bayless v. Barnhart, 427 F.3d 1121, 1216 (9th Cir. 2005)).

Where the treating physician's opinion is contradicted by the opinion of an examining physician who based the opinion upon independent clinical findings that differ from those of the treating physician, the nontreating source itself may be substantial evidence, and the ALJ is to resolve the conflict. Andrews, 53 F.3d at 1041. However, if the nontreating physician's opinion is based upon clinical findings considered by the treating physician, the ALJ must give specific and legitimate reasons for rejecting the treating physician's opinion that are based on substantial evidence in the record. Id.

"The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Magallanes, 881 F.2d at 751 (quoting Cotton v. Bowen, 779 F2d 1403, 1408 (9th Cir. 1989)).

In his opinion, the ALJ considered that

> the record reflects that [Plaintiff] has received treatment for chronic migraines since her alleged onset date. [Plaintiff's] migraines occur more than once a week and last for several hours. (AR 29.) In addition, they cause her to experience symptoms including nausea, vomiting, light sensitivity, auras, throbbing pain, dizziness, and blurred vision. Furthermore, although she has received medication treatment for her symptoms, her response to medication treatment has been fair to poor.

> As for the medical evidence concerning [Plaintiff's] depression and anxiety disorders, the record reflects that Plaintiff's primary care physician has treated [Plaintiff's] mental health symptoms with psychiatric medication since her alleged onset date. During consultative examinations, [Plaintiff] reported that she had never used outpatient mental health services, been hospitalized for her mental

health symptoms, had suicidal ideation, or attempted suicide. Additionally she reported that her symptoms of depression related primarily to her physical condition and her ill husband's condition. On the Beck Depression Inventory, [Plaintiff] obtained a score of 41, suggesting severe depression.

(AR 29.)

### 1. Dr. Le

Plaintiff argues that the ALJ erred in rejecting the opinion of Dr. Le because the medical records note that Plaintiff looked depressed and anxious and on occasion looked as if she is in pain. Defendant argues that the ALJ properly considered and provided legitimate and specific reasons to reject Dr. Le's opinion because it was vague and was based upon Plaintiff's subjective complaints.

While the ALJ must consider all medical evidence, "[t]he treating physician's opinion is not" "necessarily conclusive as to either physical condition or the ultimate issue of disability." Magallanes, 881 F.2d at 751. But the ALJ may not simply reject the treating physician's opinion on the ultimate issue of disability. Ghanim v. Colvin, 763 F.3d 1154, 1154 (9th Cir. 2014). To reject the contradicted opinion of the treating physician, the ALJ must provide specific and legitimate reasons that are supported by substantial evidence. Id.

The ALJ considered that on various occasions between August 17, 2012, and November 20, 2013, Dr. Le opined that Plaintiff was off work for specified periods of time or unable to go back to work. (AR 32.) The ALJ gave little weight to Dr. Le's opinion that Plaintiff was temporarily or permanently unable to work because his opinion was based on Plaintiff's subjective complaints and do not include a detailed discussion of the findings which support the opinions. (AR 32.) Additionally, the ALJ found that the opinions were vague as to the specific functional limitations and how those specific functional limitations affected Plaintiff's ability to perform any work. (AR 32.) The ALJ also found the opinions to be vague because they do not identify which impairments cause the alleged disabling limitations and some of them concern a period prior to the alleged onset date and are irrelevant for the current purpose. (AR 32, 249, 250, 251, 278, 279, 292.) Finally, the final responsibility for determining disability is an issue reserved for the Commissioner. (AR 32.)

Plaintiff saw Dr. Le on August 5, 2011, complaining of headaches and swelling in her face and numbness. (AR 251.) Plaintiff had edema in the eye area and there are no neurologic findings. (AR 251.)

Dr. Fahlen saw Plaintiff on March 16, 2012, and she was noted to be in moderate distress (anxious). (AR 304.) Plaintiff had a normal examination and was assessed with retention of urine. (AR 304.)

Plaintiff was seen by Dr. Fahlen on April 19, 2012, complaining of problems with decreased urine output. (AR 302.) Plaintiff reported that she was working as an order selector and does a lot of walking. (AR 302.) She has a water bottle that she tries to drink but was getting dizziness and lightheadedness. (AR 302.) Plaintiff was noted to be in moderate distress (anxious). (AR 302.) Plaintiff had a normal examination and there were no signs of infection or kidney dysfunction. (AR 302.) Plaintiff was encouraged to increase her water intake. (AR 302.)

Plaintiff saw Dr. Le on August 17, 2012, complaining of anxiety, headaches-migraines. (AR 251.) She had some edema and there are no neurologic findings. (AR 251.) She was placed off work until August 31, 2012. (AR 251.)

Plaintiff was seen by Dr. Le on August 31, 2012; and September 28, 2012 complaining of headaches and dizziness and there are no neurologic findings. (AR 250.) Plaintiff was placed off work until September 30, 2012, and November 30, 2012 respectively. (AR 250.) On November 26, 2012, Dr. Le's neurologic exam notes looks bad and Plaintiff was diagnosed with headaches and anxiety. (AR 249.) Dr. Le placed Plaintiff off work until January 30, 2013. (AR 249.)

Plaintiff was seen by Dr. Le on January 14, 2013 complaining of anxiety and headache. (AR 249.) The neurological examination notes she does not look good, anxious and depressed. (AR 249.) Plaintiff was diagnosed with anxiety, headache, and depression. (AR 249.) Dr. Le placed Plaintiff off work until March 30, 2012. (AR 249.)

On February 12, 2013, Dr. Fahlen completed a migraine headache questionnaire. (AR 254.) Dr. Fahlen reported that Plaintiff had headaches in the occipital area more than three times per week. (AR 254.) Plaintiff's headaches last several hours. (AR 254.) Plaintiff has aura,

nausea/vomiting, and photophobia. (AR 254.) Plaintiff takes Excedrin, hydrocodone, and ibruprofen and has a poor response. (AR 254.) Dr. Fahlen opined that Plaintiff's migraines interfere with her ability to work and notes that she quit her job. (AR 254.) Dr. Fahlen did not respond to the average number of days that would be missed per week due to Plaintiff's migraines. (AR 254.)

On February 20, 2013, Plaintiff saw Dr. Le complaining of having headaches on and off on the top of her whole head almost every day that last for hours and sometimes the whole day and that she had thrown up. (AR 279.) On neurological examination, Dr. Le noted confusion. (AR 279.) Dr. Le completed a migraine headache form. (AR 256.) Dr. Le stated that the location of Plaintiff's headaches were "whole head, on top, sometimes right side (temporal area)." (AR 256.) Plaintiff has more than one headache a week and the average duration of her headache is several hours to a whole day. (AR 256.) Plaintiff does not have aura. (AR 25.) She has nausea/vomiting, photophobia and throbbing/pulsing. (AR 256.) Plaintiff has not been to the emergency room within the last 12 months. (AR 256.) Plaintiff is taking Vicodin, Xanax, and Midrin and has had a fair response. (AR 256.) Dr. Le opined that Plaintiff's headaches interfere with Plaintiff's ability to work and the average number of days missed per week would be about one day. (AR 256.)

On March 25, 2013, Plaintiff saw Dr. Le complaining that she still had bad headaches and anxiety. (AR 279.) The neurologic examination notes looks not good, anxious, tired. (AR 279.) Plaintiff was diagnosed with anxiety and headaches. (AR 279.) Dr. Le placed Plaintiff off work until May 30, 2013. (AR 279.)

Dr. Le saw Plaintiff on May 22, 2013, and she complained of headaches, anxiety, and fatigue. (AR 278.) Neurological examination findings appear to note some dizziness. (AR 278.) Plaintiff was diagnosed with headache, anxiety, and fatigue. (AR 278.) Dr. Le placed Plaintiff off work until July 30, 2013. (AR 278.)

On July 19, 2013, Plaintiff saw Dr. Le complaining of a headache. (AR 278.) The record notes she looks anxious, tired, and depressed. (AR 278.) Dr. Le placed Plaintiff off work until September 30, 2013. (AR 278.)

On August 2, 2013, Plaintiff saw Dr. Fahlen and reported having a lot of migraines and poor sleep. (AR 300.) Plaintiff stated that her migraines are severe with nausea and vomiting, blurred vision, and difficulty breathing. (AR 300.) Plaintiff's husband is on dialysis and not doing well. (AR 300.) He is not eating, is getting confused at night, and has bowel incontinence. (AR 300.). Plaintiff is noted to be in moderate distress (anxious). (AR 300.) Plaintiff's examination was normal. (AR 300.)

Plaintiff was seen by Dr. Fahlen on September 11, 2013, and complained of 4 to 5 headaches a week. (AR 298.) Plaintiff reported that Ibuprofen helps a little, metoclopramide makes her drowsy, and she was having difficulty urinating. (AR 298.) Plaintiff was noted to have moderate distress (anxiety). (AR 298.) Plaintiff's examination was normal. (AR 299.)

Dr. Le saw Plaintiff on September 20, 2013, and she complained of headaches, anxiety, and dizziness. (AR 292.) Neurological examination notes that Plaintiff looks anxious, tired and depressed. (AR 292.) Plaintiff was placed off work until November 30, 2013. (AR 292.)

On November 15, 2013, Plaintiff was seen by Dr. Fahlen for a follow-up appointment. (AR 295.) She reported that her headaches were not improved. (AR 296.) Plaintiff reported working around her house and getting on the treadmill a couple times a week. (AR 296.) Plaintiff was noted to be in moderate distress (anxious). (AR 297.) Plaintiff had a normal examination. (AR 297.) Plaintiff's medication was changed. (AR 297.)

Plaintiff was seen by Dr. Le on November 20, 2013, complaining of headaches and anxiety and reported doing better on her medication. (AR 292.) Neurological examination notes that Plaintiff looks anxious. (AR 292.)

Dr. Fahlen saw Plaintiff on January 3, 2014, for a headache. (AR 294-295.) Plaintiff was noted to be in moderate distress. (AR 295.) Plaintiff had a normal examination and was diagnosed with a refractory migraine. (AR 295.)

Plaintiff was seen by Dr. Le on January 13, 2014, complaining of a headache and nausea. (AR 291.) She is noted to be crying due to headache. (AR 291.) There are no neurological findings and Plaintiff is diagnosed with a headache, 8 hours. (AR 291.)

/ / /

On March 5, 2014, Dr. Le saw Plaintiff who was complaining of a headache and anxiety. (AR 291.) There are no neurological findings and Plaintiff is diagnosed with a headache. (AR 291.)

The ALJ gave little weight to Dr. Le's opinion that Plaintiff was unable to work because it was based on Plaintiff's subjective complaints and the record does not contain detailed finding to support the opinion. (AR 32.) The ALJ also found that the opinions are inconsistent with and unsupported by evidence that the claimant was able to work, despite her migraines, until stopping work in September 2012. (AR 32.) The opinion was also found to be inconsistent with and unsupported by Plaintiff's testimony that she stopped work to care for her husband. (AR 32.)

First, the ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported by clinical findings. Thomas, 278 F.3d at 957. Here, while there are notations in the record that Plaintiff appears depressed, anxious, and occasionally in pain, the record shows generally normal examination findings. (AR 249, 250, 251, 278, 279, 291, 292, 295, 297, 299, 300, 302, 304.) Also, the ALJ pointed out that Dr. Le did not include findings to support the opinion. (AR 32.) While Dr. Le noted on occasion that Plaintiff looked bad, anxious, depressed, or tired these are vague finding that do not translate to functional limitations. The ALJ properly considered that there were no detailed findings in the medical record to support Dr. Le's opinion that Plaintiff was unable to work and that Dr. Le's opinion did not include functional limitations.

During the relevant time period there are few findings in the record of Plaintiff appearing in pain, and the opinion regarding her inability to work due to her headaches does appear to be based on her subjective complaints. (AR 291, 295.) An ALJ can reject a physician's opinion that is premised on a claimant's subjective complaints that have been properly discounted. Fair, 885 F.2d at 605. The ALJ properly considered that Dr. Le's opinion was based on Plaintiff's subjective complaints that have been properly discounted.

The ALJ also considered the consultative physical examinations performed by Dr. Gable on April 9, 2013; and August 30, 2014. (AR 32, 261-263, 321-323.) Dr. Gable examined Plaintiff on April 9, 2013, with the assistance of an interpreter. (AR 261.) Plaintiff reported her

chief complaints as dizziness, migraines, vision problems, breathing difficulties, and sleep apnea. (AR 261.)

Plaintiff reported having chronic migraine headaches for years that have been getting worse as she was having vision problems. (AR 261.) Plaintiff also was having nausea and vomiting. (AR 261.) Plaintiff complained of daily headaches on the right side of the neck that are pounding and radiate to the back of the head. (AR 261.) Plaintiff often lies down with her headaches. (AR 261.) Plaintiff takes medication for her headaches but reports that it does not help. (AR 261.) Plaintiff has some dizziness and reported that the room felt as if it was spinning during the examination. (AR 261.) Plaintiff's dizziness can come on while standing, sitting, or walking and she reports that on occasion she must ask for help in standing and walking because the dizziness makes her feel unsteady. (AR 261.) Plaintiff also describes shortness of breath or a feeling of anxiety when she gets dizziness from the migraines. (AR 261.) Plaintiff reports difficulty sleeping at night and a history of anxiety and depressive symptoms. (AR 261.)

Plaintiff reported that she was born in Cambodia and has lived in the United States for about 30 years. (AR 261.) Plaintiff has no formal education. (AR 261.) Plaintiff is married and lives with her husband. (AR 261.) Plaintiff worked primarily in printing and paperwork taking orders for a wholesale company. (AR 261.) Plaintiff stopped working in August 2012 because of problems with vision, dizziness, headaches, sleep, and stress. (AR 261.)

Plaintiff was cooperative throughout the examination and appeared concerned and anxious. (AR 262.) Plaintiff was visually able to move about the office without assistance. (AR 262.) Plaintiff had a generally normal physical examination. (AR 262.) Dr. Gable found:

> 1. Migraines. I think they may be more of a tension type headache. It is there consistently although it could be migrainous. Normal neurologic testing today.
> 2. Dizziness. I think that it is largely vertigo, probably benign positional based on the way she experiences dizziness with changes in head position today and the nystagmus that I saw which was horizontal rather than vertical.
> 3. Breathing problems associated with anxiety. Normal pulmonary exam.
> 4. Insomnia.
> 5. Anxiety and depression, per the claimant, for which she reports that she takes medication.

(AR 262.)

Dr. Gable opined that Plaintiff could push, pull, lift, and carry 50 pounds occasionally

and 20 pounds frequently because of body size; walk and/or stand 6 out of 8 hours in a workday with regular breaks; sit 8 out of 8 hours in a workday with regular breaks; should avoid repeated bending; should avoid climbing ladders and walking on uneven terrain because of dizziness, and had no restrictions in hearing and seeing; and using hands for fine and gross manipulative movements. (AR 263.)

The ALJ gave this opinion partial weight because it provides a detailed discussion of the evidence relied upon, and the opinion is in an area of Dr. Gable's expertise. (AR 30.) Further, the ALJ found that the clinical findings were consistent with the opinion and the record as a whole including Plaintiff's medication treatment, level of care, and activities of daily living. (AR 30.) The ALJ found that Dr. Gable's opinion that Plaintiff had postural limitations was consistent with evidence in the record, but that her opinion that Plaintiff should avoid bending was vague and unclear as to the frequency with which Plaintiff can perform the activity. (AR 30.) The ALJ also found that Dr. Gable did not adequately accommodate for Plaintiff's dizziness and Plaintiff should have greater limitations in regard to hazards than opined by Dr. Gable. (AR 30.) "[W]hen an examining physician provides 'independent clinical findings that differ from the findings of the treating physician,' such findings are 'substantial evidence.' " Orn, 495 F.3d at 632 (citations omitted). Dr. Gable's opinion itself is substantial evidence to support the ALJ's opinion. Andrews, 53 F.3d at 1041.

On August 30, 2014, Plaintiff had a second consultative examination by Dr. Gable. (AR 321-323.) Plaintiff was assisted by a professional interpreter. (AR 321.) Plaintiff reported having severe headaches for many years although she could not say how many. (AR 321.) Her headaches have become more severe over the last three years. (AR 321.) Sometimes Plaintiff's headaches are on the right and sometimes they are on the left. (AR 321.) They can involve her whole head. (AR 321.) Plaintiff can have headaches on a daily basis and they can last for hours or days at a time. (AR 321.) Plaintiff sometimes has nausea and vomiting and feels like her vision blurs. (AR 321.) Plaintiff takes medications for the headaches. (AR 321.) Plaintiff also complains of dizziness that comes and goes. (AR 321.) She has been evaluated but there has been no etiology determined. (AR 321.)

Plaintiff quit working in 2013 because of headaches and dizziness. (AR 321.) Plaintiff was working in a warehouse setting up boxes and piling them together. (AR 322.) Plaintiff quit working due to headaches, dizziness and memory problems. (AR 321.) Plaintiff also had back problems making it difficult for her to walk and stand. (AR 322.) Plaintiff describes a history of depression and anxiety for which she believes she has seen a psychiatrist in the past. (AR 321.)

Plaintiff lives with her husband and son. (AR 321.) At times she does the cooking and cleaning. (AR 321.) Plaintiff does drive. (AR 321.)

Plaintiff was oriented and in no acute distress. (AR 322.) Plaintiff was able to get on and off the exam table with ease and without complaints of low back or leg pain. (AR 322.) She was visually able to move around the office without assistance. (AR 322.) Plaintiff's physical examination was generally normal. (AR 322.)

Dr. Gable opined that Plaintiff could push, pull, lift, and carry 20 pounds occasionally and 10 pounds frequently; walk and/or stand 8 hours cumulatively in a workday with appropriate breaks; sit 8 hours cumulatively in a workday with appropriate breaks; can bend, stoop, kneel, crawl, and crouch occasionally; should avoid climbing ladders and walking on uneven terrain, and had no restrictions in hearing and seeing; and using hands for fine and gross manipulative movements. (AR 323.)

Dr. Gable also completed a medical source statement of ability to do work related activities this same date in which she opined that Plaintiff could frequently lift 20 pounds and occasionally lift 50 pounds, and could frequently carry 10 pounds and occasionally carry 50 pounds due to her small boy build but normal strength. (AR 324.)

The ALJ gave little weight to Dr. Gable's August 30, 2014 consultative examination and medical source statement because although they concern the same evaluation they set forth different limitations. (AR 31.) The ALJ found that the opinions are inconsistent between themselves and it was therefore unclear which limitations would apply. (AR 31.) The ALJ may properly reject a doctor's opinion that is internally inconsistent. Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001); Johnson v. Shalala, 60 F.3d 1428, 1433 (9th Cir. 1995). The ALJ properly rejected the limitations opined by Dr. Gable in the August 30, 2014 reports because

they contained inconsistent findings.

The ALJ also considered the opinion of the agency physicians, Dr. Ballard and Dr. Fast who reviewed Plaintiff's medical records and issued opinions on April 26, 2013, and September 24, 2013, respectively. (AR 30-31, 76-79, 90-92, 102-107.) After review of the record, Dr. Ballard and Dr. Fast found that Plaintiff was able to lift and/or carry (including upward pulling) 50 pounds occasionally and 25 pounds frequently; stand, walk, and/or sit (with normal breaks) about 6 hours in an 8 hour workday; and occasionally stoop and balance. (AR 30, 78, 91, 105-106.) Dr. Ballard opined that Plaintiff could occasionally climb ladders, ropes, and scaffolds; while Dr. Fast opined that Plaintiff could never do these activities. (AR 30, 78, 91.) Dr. Fast opined that Plaintiff should avoid even moderate exposure to hazards such as machinery and heights. (AR 30-31, 106-107.) Dr. Ballard gave great weight to the April 9, 2013 opinion of Dr. Gable which he opined was consistent with the totality of the evidence and found that the medical evidence of record supports a medium RFC. (AR 79, 92.) Dr. Fast conducted a review upon reconsideration and agreed with Dr. Ballard's findings except that he opined Plaintiff needed height and hazard restrictions due to dizziness. (AR 102, 107.)

The ALJ found the opinions of Dr. Ballard and Dr. Fast to be overall consistent with the the evidence of Plaintiff's activities of daily living, level of care, clinical findings and observations, medication treatment. (AR 31.) In addition the opinions were found to be based on Plaintiff's medical records and contained a detailed discussion of the evidence reviewed and/or relied upon and to be overall consistent with the opinion of Dr. Gable. (AR 31.) The ALJ gave partial weight to the April 9, 2013 opinion of Dr. Ballard and great weight to the opinion of Dr. Fast because it was consistent with and better accommodates Plaintiff's postural and environmental limitations. (AR 31.)

The contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it may constitute substantial evidence when it is consistent with other independent evidence in the record." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). Here, Dr. Fast's opinion is consistent with the April 9, 2013 consultative examination by Dr. Gable. Dr. Fast's opinion is

substantial evidence to reject the opinion of Dr. Le.

The Court finds that the ALJ provided legitimate and specific reasons that are supported by substantial evidence in the record to reject the opinion of Dr. Le.

2.   Dr. Morgan

Plaintiff argues that the ALJ erred in rejecting the opinion of Dr. Morgan because it was supported by the later examination of Plaintiff by Dr. Bautista.  Defendant contends that the ALJ provided valid reasons to reject the opinion of Dr. Morgan.

The ALJ gave little weight to the November 13, 2013 comprehensive psychological examination by Dr. Robert Morgan.  (AR 33-34, 306-312.)  Dr. Morgan noted that Plaintiff arrived promptly at the examination and was driven by her daughter who also acted as the interpreter for the examination and provided elaboration and clarification.  (AR 306.)  Plaintiff's chief complaint was severe depression and migraines.  (AR 33, 306.)

Plaintiff reported having migraines since 1993, but that they have been very bad the past three years.  (AR 306.)  Plaintiff states that the frequency of her migraines is variable but at times she will have migraines on a daily basis.  (AR 306.)  At the onset of her migraines, Plaintiff asserts that she will feel like she is blacking out and her eyesight gets blurry.  (AR 306.)  Plaintiff also reports diarrhea, that her arms will become numb, she will feel dizzy and overwhelmed. (AR 306.)  When Plaintiff is having a migraine she will go to bed and cannot do anything.  (AR 307.)

Plaintiff states that she has had longstanding depression that has worsened over the last 18 to 24 months.  (AR 307.)  Plaintiff lives with her husband and 30-year old son.  (AR 308.) Plaintiff's husband is quite ill, has diabetes and is undergoing dialysis treatment and may only have 1 to 2 years to live.  (AR 307.)  Plaintiff's husband is no longer employed and is home throughout the course of the day and basically sleeps all day.  (AR 307.)

Plaintiff was employed by CW Brower, a wholesale distributor, working as an order selector 8 hours per day.  (AR 307.)  Her job was quite physical, placing items on a cart and moving the carts from one location to another.  (AR 307.)  Plaintiff worked from July 1999 until August 2012, but in 2010 began to take increasing amounts of time off work.  (AR 307.)

Plaintiff reported that her migraines were getting worse and her depression was very bad and in August 2012 she reached the point that she could not take the depression and the migraines anymore. (AR 307.) Plaintiff reported that since quitting work her stress is bad because the family depended on her salary for rent and food. (AR 307.) Plaintiff stated that she feels hopeless and worries about her husband passing every day. (AR 307.)

Plaintiff states that she is home all day long and will do some things in the house if she is feeling good but when she has a migraine she just lies down and does nothing. (AR 307.) Plaintiff's daughter reported that her mother does not want to see her children or grandchildren and is isolating herself from the family. (AR 307.) Plaintiff has no hobbies and is engaged in no activities and does not even watch television. (AR 307.) Plaintiff contends that her energy is severely diminished and her sleep is impaired. (AR 307.) Plaintiff is engaged in minimal domestic activities and her children prepare meals, provide transportation, and assist the parents with paying bills. (AR 307.) Plaintiff states that she has lost 10 to 15 pounds and used to walk but is no longer walking. (AR 307.) Plaintiff reports being tearful during the day, having lots of friends in the past but no longer interacting with them, and that she used to enjoy attending activities at the Cambodian temple, but her daughter reports she barely wants to go. (AR 307.)

Plaintiff was noted to have no specific difficulties with hearing or vision. (AR 309.) She was calm and cooperative, sitting nearly motionless in her chair. (AR 309.) No bizarre or unusual behavior is noted. (AR 309.) Plaintiff's mood is severely depressed with flat, fixed, and unchanged affect. (AR 33, 309.) Plaintiff's eye contact is poor and she looks at the floor throughout the examination. (AR 33, 309.)

Plaintiff's speech is slow in rate and rhythm, soft in tone and volume. (AR 309.) Plaintiff answers questions simply without elaboration. (AR 309.) Plaintiff speaks in short sentences and her daughter reports that her fluency and vocabulary is below average. (AR 309.) Plaintiff is ambulatory, alert, and oriented to person, place, and time. (AR 309.) Plaintiff's working memory is impaired; recent and remote memory are fair. (AR 33, 310.) Plaintiff is able to engage in simple addition and subtraction but unable to engage in more complex calculations. (AR 33, 310.) Serial sevens are impaired. (AR 33, 310.) Thought processes are coherent and

goal oriented. (AR 310.) There is no evidence of hallucinations, delusions, thought blocking, ideas of reference or obsessions. (AR 310.) Plaintiff reports no perceptual abnormalities. (AR 310.) Plaintiff's intelligence is estimated to be low average to average. (AR 310.) Plaintiff is unable to interpret simple proverbs. (AR 310.) Similarities and differences is fair. (AR 310.) Insight and judgment are fair. (AR 310.)

Plaintiff was administered the Beck Depression Inventory II which she completed with her daughter. (AR 33, 306, 310.) She presented with a score of 41 which is suggestive of severe depression. (AR 33, 310.) Plaintiff reports that she is sad all the time, feels her future is hopeless and will only get worse, looks back and sees a number of failures, is unable to derive pleasure from things that she used to enjoy, feels guilty over things that she should have done, believe she is being punished, dislikes herself, blames herself for everything bad that happens, and is tearful over every little thing. (AR 310.) Plaintiff reports restlessness and agitation, difficulty getting interested in anything, trouble making decisions, feeling utterly worthless, insufficient energy to do anything, sleeping most of the day, irritability, loss of appetite, inability to concentrate, too tired and fatigued to do things she used to do, and less interest in sexual activities. (AR 310.)

Plaintiff was diagnosed with major depressive disorder, single episode, severe without psychosis, and a GAF of 50.[2] (AR 33, 311.) Dr. Morgan opined that Plaintiff likely has historically met the criteria for post-traumatic stress disorder although her presentation at this time does not appear to precisely satisfy diagnostic criteria. (AR 311.) Plaintiff presented with a marked impairment in ability to maintain her activities of daily living; marked impairment in her ability to maintain social functioning; and marked impairment in her concentration, persistence and pace. (AR 311-312.) Dr. Morgan found Plaintiff markedly impaired in her ability to perform activities within a clear schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal work day and work week without interruptions from

---

[2] A GAF range of 41–50 reflects "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Vanbibber v. Carolyn, No. C13-546-RAJ, 2014 WL 29665, at *1 (W.D. Wash. Jan. 3, 2014) (quoting American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders Multiaxial Assessment 30, 32 (4th ed. Text rev. 2000) (DSM-IV)).

psychologically-based symptoms and perform at a consistent pace; interact with coworkers and the public and withstand the stress of a routine work day and deal with various changes in the work setting. Dr. Morgan opined that the likelihood is high that Plaintiff would emotionally deteriorate in a work like environment and that Plaintiff has been disabled to this point since she applied for disability. (AR 312.) Plaintiff's likelihood of improving over the course of the next 12 months is poor and she is not capable of managing funds. (AR 33-34, 312.)

The ALJ considered those areas that Dr. Morgan found Plaintiff to be markedly impaired. (AR 33-34.) He also considered that Dr. Morgan found that Plaintiff met Listing 12.04 opining she had a pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, decreased energy, feelings of both guilt and worthlessness, and difficulty in concentration and also found that she was markedly impaired in her activities of daily living, social functioning, and concentration, persistence and pace. (AR 34, 311.) The ALJ rejected Dr. Morgan's opinion, because although it did provide a detailed discussion of his findings and the observations upon which he relied, he did not have the benefit of reviewing the medical reports contained in the record and relied heavily upon the subjective report of symptoms and limitations provided by Plaintiff and uncritically accepted as true most, if not all, of what Plaintiff reported. (AR 34.) However, the ALJ noted that good reasons exist to question the reliability of Plaintiff's subjective complaints. (AR 34.) Plaintiff argues the the ALJ improperly found that Dr. Morgan's opinion relied on her subjective complaints, but Dr. Morgan's opinion relied on the Beck Depression Inventory which was completed by Plaintiff with the assistance of her daughter. (AR 310.) Dr. Morgan noted that the inventory score was 41 which is suggestive of severe depression. (AR 310.) This is substantial evidence that Dr. Morgan relied on Plaintiff's subjective complaints in his opinion. The ALJ properly rejected Dr. Morgan's opinion as being premised on Plaintiff's subjective complaints that have been properly discounted. Fair, 885 F.2d at 605.

The ALJ also rejected Dr. Morgan's opinion because he found it to be internally inconsistent. (AR 34.) Specifically, Dr. Morgan found Plaintiff markedly limited in her ability to maintain regular attendance and be punctual, but Dr. Morgan noted that she was punctual for

the examination. (AR 34, 306, 312.) The ALJ also found it inconsistent that Dr. Morgan opined that Plaintiff's affective disorder met the severity of Listing 12.04, but he assessed Plaintiff with a GAF of 50. (AR 34.) The ALJ considered that a GAF range of 41–50 indicates serious symptoms or serious difficulties in functioning. (AR 34.) See also Vanbibber v. Carolyn, No. C13-546-RAJ, 2014 WL 29665, at *1 (W.D. Wash. Jan. 3, 2014) (quoting American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders Multiaxial Assessment 30, 32 (4th ed. Text rev. 2000) (DSM-IV)) (a GAF score of 41-50 reflects "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.")). While a GAF of 51-60 indicates moderate symptoms or moderate difficulties in functioning. (AR 34.) See also Cornelison v. Astrue, 2011 WL 6001698, at *4 n.6 (C.D. Cal. Nov. 30, 2011) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 34 (4th ed.2000) ("A GAF score in the range of 51–60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning ( e.g., few friends, conflicts with peers or coworkers).")). The ALJ found that the GAF score of 50 is very close to a finding of moderate symptoms or moderate difficulties in functioning which was inconsistent with the findings contained in the opinion. (AR 34.)

As relevant here, Listing 12.04, is satisfied by meeting sections A and B, or A and C:

A. Medical documentation of the requirements of paragraph 1 or 2:
1. Depressive disorder, characterized by five or more of the following:
a. Depressed mood;
b. Diminished interest in almost all activities;
c. Appetite disturbance with change in weight;
d. Sleep disturbance;
e. Observable psychomotor agitation or retardation;
f. Decreased energy;
g. Feelings of guilt or worthlessness;
h. Difficulty concentrating or thinking; or
i. Thoughts of death or suicide.
. . .
AND
B. Extreme limitation of one, or marked limitation of two, of the following areas
of mental functioning (see 12.00F):
1. Understand, remember, or apply information (see 12.00E1).
2. Interact with others (see 12.00E2).
3. Concentrate, persist, or maintain pace (see 12.00E3).
4. Adapt or manage oneself (see 12.00E4).

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.04.  While Dr. Morgan made findings which would meet section A, Plaintiff would also have to met section B because there is no evidence of medical or mental health treatment to meet the requirements of section C.  However, the ALJ found that Dr. Morgan's finding that Plaintiff's symptoms were 50, which is on the cusp of finding her symptoms to be moderate is inconsistent with marked limitations.  This is a rational interpretation of the evidence.  Burch, 400 F.3d at 679.  The ALJ properly considered that Dr. Morgan's opinion is internally inconsistent and this is a legitimate and specific reason to reject Dr. Morgan's opinion.  Rollins, 261 F.3d at 856; Johnson, 60 F.3d at 1433.

The ALJ also considered that Dr. Morgan's opinions are without substantial support from the evidence as a whole which renders them less persuasive.  (AR 34.)  The ALJ found that Plaintiff's activities of daily living indicate that she has a higher level of functioning than opined by Dr. Morgan, including her ability to attend to her own personal care and the care for her ailing husband.  (AR 34.)  Substantial evidence in the record supports this finding including Plaintiff's visit with Dr. Fahlen two weeks later in which she reported that she is working around her house and walking on the treadmill several times a week (AR 296), testimony at the June 4, 2014 hearing in which she stated that she was driving her husband three times a week to dialysis (AR 48), takes care of him by cooking for him, dressing him, and giving him shots with the help of her inlaws (AR 48), and Plaintiff's statements in the record that she is independent in her own activities of daily living (AR 258, 314).

The ALJ provided specific and legitimate reasons to reject the opinion of Dr. Morgan that are supported by substantial evidence in the record.

3.    Dr. DeBattista

Plaintiff argues that the ALJ improperly rejected Dr. DeBattista's opinion that Plaintiff was markedly impaired in her ability to maintain concentration, attention, persistence and pace.  Defendant replies that the ALJ noted Plaintiff's ability to drive a car, arrive at appointments on time, take public transportation, make change at the store, perform simple tasks, and provide care to her husband that provide specific and legitimate reasons to reject Dr. DeBattista's opinion.

The ALJ considered Plaintiff's comprehensive psychiatric examination by Dr. DeBattista on August 23, 2014. (AR 34, 313-315.) Plaintiff was assisted at the examination by a professional interpreter. (AR 313.) Plaintiff's chief complaints at the examination were headache and poor sleep. (AR 35, 313.) Plaintiff reported difficulties with her sleep reporting nightmares about events she witnessed living through the Khmer Rouge. (AR 313.) Plaintiff reported more depression the last few years since her husband's health has deteriorated and he quit working. (AR 313.) Plaintiff's husband has diabetes and has had a stroke, as well as complications from diabetes including kidney failure. (AR 313.) Plaintiff had to support her family as a result and this was stressful for her. (AR 313.) Plaintiff stopped working in 2012 because she became too depressed and anxious. (AR 313.) Plaintiff complained of being depressed all the time, having low energy, fatigue, diminished appetite with a stable weight, initial insomnia most every night, passive thoughts that life is not worth living, and feelings of helplessness and hopelessness. (AR 313.)

Plaintiff had been married for many years and had four grown children. (AR 313.) Plaintiff has no formal education. (AR 313.) Plaintiff worked as a stock clerk at a warehouse for 13 consecutive years until August 2012 when she stopped working due to stress and depression. (AR 314.) Plaintiff lives at home with her husband who has an in-home care provider to help with his medical issues. (AR 314.) Plaintiff does some chores, is able to drive, and is generally independent in her activities of daily living. (AR 314.)

Plaintiff made good eye contact and good interpersonal contact with Dr. DeBattista. (AR 314.) Plaintiff was able to move around the examination room without difficulty and there were no visual difficulties. (AR 314.) Plaintiff was generally cooperative and was able to spontaneously volunteer information. (AR 314.) There was no psychomotor agitation or retardation. (AR 314.) Plaintiff appeared genuine and truthful with no evidence of exaggeration or manipulation. (AR 314.)

Plaintiff's thought processes were coherent and organized with no tangentiality or loosening of associations. (AR 314.) Thought content was notable for some nightmares and intrusive traumatic ideation about her upbringing in the Khmer Rouge. (AR 314.) Plaintiffs'

mood was depressed and anxious and affect was restricted. (AR 314.) Plaintiff admitted to intermittent suicidal thoughts without a plan or intention. (AR 314.) Plaintiff's speech had normal rate, rhythm and tone. (AR 314.)

Plaintiff incorrectly stated the date but was oriented to person and place and appeared to be of at least average intelligence. (AR 314.) Plaintiff had impaired memory and her fund of knowledge was lacking. (AR 314.) Plaintiff's concentration and abstraction was impaired. (AR 314.) Plaintiff's insight appeared to be poor and judgment was adequate. (AR 314.)

Plaintiff was diagnosed with major depressive disorder, moderate; posttraumatic stress disorder; and assessed with a GAF of 58 which indicated moderate symptoms or moderate difficulty in social, occupational, or educational functioning. (AR 35, 315.) Plaintiff was found to have a history and presentation consistent with a major depression and was likely to have had PTSD although this did not appear to be the predominant issue at this time. (AR 315.) Plaintiff's prognosis was fair and she could be expected to improve in the next 6 to 12 months with more aggressive treatment. (AR 315.)

Dr. DeBattista opined that Plaintiff is able to understand, remember, and carry out simple one or two-step job instructions; but is unable to do complex or detailed instructions. (AR 315.) Plaintiff is mildly impaired in her ability to accept instructions from supervisors; and perform work activities without special or additional supervision. (AR 315.) Her ability to relate and interact with coworkers and the public; associate with day-to-day work activity including attendance and safety; and maintain regular attendance in the work place and perform work activities on a consistent basis is moderately impaired. (AR 315.) Plaintiff's ability to maintain concentration and attention, persistence and pace is markedly impaired. (AR 315.) Plaintiff is capable of managing her own funds. (AR 315.)

The ALJ gave partial weight to the opinion of Dr. DeBattista. (AR 35.) The ALJ considered that the opinion was based on information provided by Plaintiff at the examination and Dr. DeBattista's own clinical findings and observations of Plaintiff at the time of the examination. (AR 35.) The ALJ found that the opinion is only partially consistent with the evidence in the record which includes that Plaintiff was not receiving psychotherapy or

additional services, had not been hospitalized, and Plaintiff's demonstrated level of daily functioning. (AR 35.)

The ALJ found that Dr. DeBattista's opinion that Plaintiff was markedly impaired in her ability to maintain concentration, persistence, and pace was inconsistent with and unsupported by the record as a whole, including Plaintiff's ability to drive, arrive at appointments on time, take public transportation, make change at the store, provide care to her ill husband and perform simple tasks. (AR 35.) Substantial evidence supports the ALJ's finding that the record does not support Dr. DeBattista's opinion that Plaintiff had marked limitations in her ability to maintain concentration, persistence and pace.

Specifically, although Dr. DeBattista found Plaintiff to be markedly impaired he assessed a GAF of 58, at the high end of moderate symptoms. A GAF score of 61 to 70 indicates mild symptoms or some difficulty in social, occupational, or school functioning. Macias v. Colvin, No. 1:15-CV-00107-SKO, 2016 WL 1224067, at *7 (E.D. Cal. Mar. 29, 2016). Further, Plaintiff told Dr. DeBattista that she does some chores, is able to drive, and is generally independent in her activities of daily living. (AR 314.) Also evidence in the record shows that she was caring for her husband, including administering his medications, bathing him, feeding him, and going with him and staying during his three and a half to four hour dialysis treatments. (AR 48, 53-54, 258, 314, 321.) Review of the medical record shows a single finding of confusion by her treating physicians on February 20, 2013. (AR 279.) Further neurological examinations reported no such findings and were generally normal. (AR 278, 291, 292, 295, 297, 299, 300.) Finally, the ALJ relied upon the opinions of Dr. Martin, Dr. Atkins and Dr. Ikawa, as discussed below, which are substantial evidence in support of the ALJ's findings.

The ALJ provided legitimate and specific reasons to reject Dr. DeBattista's findings that are supported by substantial evidence in the record.

4.    Dr. Martin

Plaintiff argues that the ALJ did not provide reasons to reject those portions of consultative examiner, Dr. Martin's, report. Defendant responds that the ALJ properly limited Plaintiff to simple, routine tasks which is consistent with her moderate limitations in

concentration, persistence, and pace.

The ALJ considered that Plaintiff had a consultative psychological examination with Dr. Paul Martin on April 9, 2013. (AR 32, 257-259.) Plaintiff was brought to the appointment by her daughter and arrived on time. (AR 257.) Plaintiff's examination was conducted with a Cambodian interpreter. (AR 257.) Plaintiff reported that she has been in the United States for 31 years and has taken English as a Second Language classes in the past. (AR 257.) Although an interpreter was used during the examination, Plaintiff reported that she is able to carry on simple conversations in English. (AR 257.)

Plaintiff's chief complaints were headaches, depression, anxiety, and vision problems. (AR 257.) Plaintiff reported that she had depression and anxiety for many years and they have intensified over the past two years. (AR 257.) Plaintiff stated that her depression primarily relates to her medical status. (AR 257.) Plaintiff has a lot of migraine headaches and the pain is very upsetting to her. (AR 257.) Even when she is not having headaches she thinks about her medical problems. (AR 257.) Also, Plaintiff's husband is quite ill with cerebrovascular disease and diabetes, and is currently on dialysis. (AR 257.) Plaintiff has never received mental health counseling, but Plaintiff is taking Prozac and Xanax with some benefit. (AR 257.)

Plaintiff is married with four grown children. (AR 258.) She was born in Cambodia and came to the United States when she was about 19 or 20 years old. (AR 258.) Plaintiff has no formal education, but did take some ESL classes quite a while ago. (AR 258.) Plaintiff mainly worked in warehousing and processing type jobs. (AR 258.) She stopped working in 2012 due to her medical condition. (AR 258.) Plaintiff reported having disruption with her work for a number of years due to both anxiety and medical problems. (AR 258.)

Plaintiff is independent with her basic activities of daily living. (AR 258.) Plaintiff reported she is able to prepare simple meals, do light household chores, make change at the store, take public transportation, and drive a car but does so on a limited basis. (AR 258.) Plaintiff reports that she lives at home with her husband and two of her children and spends the day at home resting. (AR 258.)

Plaintiff was friendly but had a somewhat distressed manner and was cooperative during

the evaluation. (AR 258.) Plaintiff made good eye contact and her facial expression revealed some pain. (AR 258.) Plaintiff would squint and appear to have difficulty concentrating for extended periods of time. (AR 258.) Gross motor function was normal and there were no tics or tremors observed. (AR 258.) Plaintiff was able to ambulate without assistance and exhibited no bizarre behavior. (AR 258.) Plaintiff reported that even when she is not having a migraine she has blurry vision. (AR 258.) Plaintiff was able to walk room to room without assistance. (AR 258.) Plaintiff was given a couple table top tasks and seemed able to see the details without difficulty. (AR 258.)

Plaintiff was oriented to person, place, and time. (AR 258.) Speech was normal for rate, tone, and rhythm per the interpreter. (AR 258.) Plaintiff's mood was depressed and affect was congruent. (AR 258.) Plaintiff's attention was poor and fund of knowledge was limited. (AR 258.) Plaintiff's memory was adequate and she was able to perform a simple mathematical calculation. (AR 259.) Plaintiff's abstraction was poor and she was unable to interpret a proverb. (AR 259.) Plaintiff's insight was fair, thought processes were linear and goal directed, and thought content was normal. (AR 259.) The ALJ considered that Dr. Martin diagnosed Plaintiff with major depressive disorder, recurrent, moderate; general anxiety disorder (possible past episodes of panic attack); pain disorder associated with migraine headaches; and assessed with a Global Assessment of Function ("GAF") Score[3] of 60 which indicates moderate difficulty in social, occupational, or educational functioning. (AR 32, 259.)

Dr. Martin opined that Plaintiff was mildly limited in her ability to understand, remember, and carry out simple instructions; and ability to interact with the public, supervisors, and coworkers in a work setting. (AR 32, 259.) Plaintiff was moderately impaired in her ability to understand, remember, and carry out detailed and complex instructions; maintain attention and

---

[3] "A Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations." Cornelison, 2011 WL 6001698, at *4 n.6 (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 32 (4th ed.2000)). "A GAF score in the range of 51–60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." Cornelison, 2011 WL 6001698, at 4 n.6 (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 34).

concentration throughout the current evaluation; maintain pace and persistence throughout the current evaluation; endure the stress of the interview; and adapt to changes in routine work-related settings.  (AR 32, 259.)  Plaintiff was also found to be capable of managing funds independently.  (AR 32, 259.)

The ALJ gave great weight to the opinion of Dr. Martin because it was based on an examination of Plaintiff, information provided by Plaintiff at the examination, and Dr. Martin's own clinical findings and observations of Plaintiff during the examination.  (AR 33.)  Further, the subject matter of the examination was within Dr. Martin's area of expertise.  (AR 33.)  The Social Security regulations provide that generally more weight is given "to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."  20 C.F.R. § 404.1527.

The ALJ found the opinion is consistent with and supported by the evidence in the record.  (AR 33.)  The ALJ specifically noted that Plaintiff has not been referred to a psychiatrist, received psychotherapy or been hospitalized for psychiatric issues.  (AR 33, 52, 257.)  He also found the opinion to be consistent with Plaintiff's ability to care for her own personal needs and to care for her ailing husband.  (AR 33, 48, 54, 258, 314.)  Finally, the ALJ found that Dr. Martin's opinion is consistent with and supported by Plaintiff's own statements to him during the examination that her symptoms are primarily related to her physical condition.  (AR 33, 257.)

The ALJ also gave great weight to the opinions of the agency physicians, Dr. Atkins and Ikawa.  (AR 33.)  Dr. Atkins and Dr. Ikawa reviewed the medical evidence on May 3, 2013; and September 23, 2013, respectively.  (AR 33, 102-104, 107-109.)

Dr. Atkins found that Plaintiff was moderately limited in her ability to understand and remember detailed instructions but was not significantly limited in her ability to remember locations and work-like procedures; and understand and remember very short and simple instructions.  (AR 92.)  Plaintiff was moderately limited in her ability to understand and remember detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; and complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a

consistent pace without an unreasonable number and length of rest periods.  (AR 93.)  Plaintiff was not significantly limited in her ability to carry out very simple and short instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them, and to make simple work-related decisions.  (AR 92.)  Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting; set realistic goals or make plans independently of others.  (AR 93-94.)  Plaintiff was not significantly limited in her ability to be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation.  (AR 80, 93-94.)

After reviewing the medical evidence in the record, Dr. Atkins opined that

> Overall, [Plaintiff] should be able to meet the basic mental demands of competitive, remunerative, simple work on a sustained basis particularly in settings of low social contact, including the abilities to understand, carry out, and remember simple instructions; make judgments commensurate with the functions of simple work, i.e., simple work-related decisions; respond appropriately to supervision, coworkers and work situations; & deal with changes in a routine work setting if introduced gradually.

(AR 81, 94.)  Dr. Ikawa concurred with this opinion on reconsideration.  (AR 109.)

While Plaintiff argues that the residual functional capacity assessment did not contain the moderate limitations opined by Dr. Martin, the residual functional capacity findings need not be identical to the relevant limitations but must be consistent with them.  <u>Turner v. Comm'r of Soc. Sec.</u>, 613 F.3d 1217, 1223 (9th Cir. 2010).  "[A]n ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony."  <u>Stubbs-Danielson v. Astrue</u>, 539 F.3d 1169, 1174 (9th Cir. 2008).  The medical testimony relied on in the opinion is substantial evidence to support the ALJ's finding that Plaintiff had the ability to perform simple, routine, repetitive tasks that are also low stress, defined as no more than occasional decision making or changes in the work setting with occasional public and co-worker contact.

///

///

**C.     The Residual Functional Capacity Findings are Supported by Substantial**

**Evidence in the Record**

Plaintiff argues that the ALJ's errors in addressing the medical evidence and Plaintiff and her daughter's credibility cause the RFC to be without substantial support in the record. A claimant's RFC is "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). The RFC is "based on all the relevant evidence in [the] case record." 20 C.F.R. § 416.945(a)(1). "The ALJ must consider a claimant's physical and mental abilities, § 416.920(b) and (c), as well as the total limiting effects caused by medically determinable impairments and the claimant's subjective experiences of pain, § 416.920(e)." Garrison v. Colvin, 759 F.3d 995, 1011 (9th Cir. 2014). At step four the RFC is used to determine if a claimant can do past relevant work and at step five to determine if a claimant can adjust to other work. Garrison, 759 F.3d at 1011. "In order for the testimony of a VE to be considered reliable, the hypothetical posed must include 'all of the claimant's functional limitations, both physical and mental' supported by the record." Thomas, 278 F.3d at 956.

Plaintiff argues that had the ALJ found that she was capable of light work she would be required to be found disabled under the grids. However, the ALJ found Plaintiff capable of performing medium work. As discussed above, the ALJ properly considered the medical evidence and there is substantial evidence in the record to support the finding that Plaintiff has the residual functional capacity to perform medium work, except no climbing ladders, ropes, or scaffolds; occasional balancing and stooping; must avoid moderate exposure to operational control of moving machinery as well as unprotected heights; is limited to simple, routine, repetitive tasks that are also low stress, defined as no more than occasional decision making or changes in the work setting with occasional public and co-worker contact. The Court finds that there is substantial evidence in the record to support the residual functional capacity findings.

## V.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court finds that the ALJ did not err in evaluating the medical opinions, making an adverse credibility finding as to Plaintiff and Ms. Silva, and in determining Plaintiff's residual functional capacity assessment. Accordingly, IT IS HEREBY

RECOMMENDED that Plaintiff's appeal from the decision of the Commissioner of Social Security be denied.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. Within fourteen (14) days of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **August 18, 2017**

UNITED STATES MAGISTRATE JUDGE